# IN THE COURT OF APPEALS OF IOWA

No. 15-0384
Filed April 27, 2016

IN RE THE MARRIAGE OF SARAH L. KINGREY
AND JUSTIN J. KINGREY

Upon the Petition of
**SARAH L. KINGREY,**
        Petitioner-Appellee,

And Concerning
**JUSTIN J. KINGREY,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Marion County, Richard B. Clogg,
Judge.

        The father appeals from the dissolution decree entered by the district court
after trial, challenging the placement of the minor child in the mother's physical
care as well as the distribution of debts. **AFFIRMED AS MODIFIED AND
REMANDED.**

        Cathleen J. Siebrecht of Siebrecht Law Firm, Des Moines, for appellant.

        Matthew B. Moore of The Law Offices of Matthew B. Moore, P.L.L.C.,
Oskaloosa, for appellee.

        Heard by Potterfield, P.J., and Mullins and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

Justin Kingrey appeals from the district court's decree dissolving his marriage to Sarah Kingrey. Justin challenges the court's placement of the parties' minor child, K.K., in the physical care of the mother rather than ordering joint physical care of the child. In the alternative, he asks for additional scheduled parenting time with the child. Additionally, he maintains the district court's distribution of the marital debts was inequitable, and he requests we award him appellate attorney fees. In response, Sarah asks that we affirm the district court's decree and award her appellate attorney fees.

**I. Background Facts and Proceedings.**

Justin and Sarah were married in April 2010, and their daughter, K.K., was born in December 2013. The parties separated in the spring of 2014, and Sarah filed a petition for divorce in June 2014.

Sarah has three other minor children in addition to K.K., and she has physical care of them. Justin has two other minor children. He does not have physical care of them, but he has regularly-scheduled parenting time with each child.

Sarah is employed as a medical transcriptionist—a job she transitioned to while the parties were married because she could do it from home. She earns approximately $37,000 annually. Justin is a Lieutenant Deputy Sheriff and earns approximately $66,000 annually.[1] He works twelve-hour overnight shifts, which start at 9:00 p.m. He is scheduled seven of every fourteen nights. He works

---

[1] We acknowledge that Justin's net income is reduced by his three child support obligations.

overnight Monday, Tuesday, Friday, Saturday, Sunday one week, and then overnight Wednesday and Thursday the next week. Justin could be called into work on nights he is not scheduled, although he testified he did not remember that ever having happened. His mother, who lives only a few blocks from him, would take care of K.K. in Justin's home if he had to go into work while K.K. was in his care.

Before the parties separated, they lived as a blended family. All of the children recognized their stepparent as a parent, calling them mom or dad. Justin coached or acted as an assistant coach for teams on which Sarah's children played, and he took Sarah's daughter to a father/daughter dance. The family discussed Justin adopting Sarah's children.

When Justin moved out of the marital home he immediately terminated contact with Sarah's children. Sarah continued to seek out and communicate with Justin's children until June 2014, when Justin demanded she stop contacting them. At the dissolution hearing, Justin testified he told Sarah to stop only after his children expressed discomfort at her continued communication. When asked why he ended his relationship with Sarah's children, Justin testified that his relationship with them was "starting to come in between the relationships" he had with his biological children and he valued the relationship with his biological children more.

During the parties' marriage, they purchased a home. In doing so, they used $21,000 in equity Sarah had in her previous home. At the dissolution hearing in January 2015, the parties stipulated that after subtracting the mortgage from the fair market value of the home, they had $50,626.22 in equity

in the property. However, Sarah's parents had helped the parties purchase the home by taking out a loan in their names, which Sarah and Justin agreed to be responsible for paying back. At the time of the hearing, the balance of the loan was $26,089.46. The parties had also taken a home equity loan, on which they owed $30,271.96. The parties had a balance of $31,902.35 on their credit cards. They stipulated that all but $4200 of that debt was marital debt incurred for medical expenses to enable the birth of K.K. The remaining $4200 Sarah had spent on attorney fees. Sarah had recently negotiated with each of the credit card companies to lower or eliminate the interest rates and to have the payments substantially lowered.

After the parties separated in May 2014, Justin incurred an additional $9821 in debt, which was largely for living expenses, furniture, and appliances for his new residence. After he moved out, Justin did not make any contributions toward paying the mortgage, the loan in Sarah's parents' names, or the credit card bills. He made two of the eight payments toward the home equity loan. During the same period of time, Sarah spent approximately $18,000 paying marital debt.

On July 3, 2014, Sarah and Justin entered into a temporary agreement, which provided for joint legal custody and placed K.K. in Sarah's physical care. It provided Justin scheduled parenting time four days every two weeks with one overnight period. It also provided that Justin would pay temporary child support of $591.97 per month.

The district court entered the dissolution decree on February 2, 2015. The court ordered joint legal custody of K.K. and placed her in Sarah's physical care.

Justin was given scheduled parenting time every other weekend from 5:00 p.m. Saturday until 5:00 p.m. Sunday. On the off week, Justin has parenting time from Tuesday evening until Wednesday evening. Justin was ordered to assume responsibility for all remaining credit card debt, half of the loan in Sarah's parents' names, and any new debt incurred by him. Sarah was awarded the marital home and all of the equity in it, and she was ordered to assume responsibility for half of the loan in her parents' names as well as the entire balance of the home equity loan.

Justin appeals.

## II. Standard of Review

We review cases tried in equity, such as dissolution cases, de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg,* 824 N.W.2d 481, 483–84 (Iowa 2012). We give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R. App. P. 6.904(3)(g). "Prior cases are of little precedential value, except to provide a framework for analysis, and we must ultimately tailor our decision to the unique facts and circumstances before us." *In re Marriage of Kleist,* 538 N.W.2d 273, 276 (Iowa 1995).

## III. Discussion

### A. Physical Care

Justin maintains the district court should have ordered joint physical care of K.K. rather than placing her in Sarah's physical care. In the alternative, if we do not award joint physical care of K.K., he asks that we provide him with more scheduled parenting time of K.K.

When physical care is at issue in marriage dissolution cases, the primary consideration is the best interests of the child. Iowa R. App. P. 6.904(3)(o). Pertinent to our ruling is the application of Iowa Code section 598.41(5)(a) (2013) to these facts. This section states, in part:

> [T]he court may award joint physical care . . . upon the request of either parent . . . . If the court denies the request for joint physical care, the determination shall be accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child.

Iowa Code § 598.41(5)(a). "[T]his passage does not create a presumption in favor of joint physical care." *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). Rather, our statutory scheme simply makes joint physical care a viable option if it is in the child's best interests. *Id.* "The critical question in deciding whether joint physical care is . . . appropriate is whether the parties can communicate effectively on the myriad of issues that arise daily in the routine care of a child." *In re Marriage of Hynick*, 727 N.W.2d 575, 580 (Iowa 2007).

In determining what custodial arrangement is in K.K.'s best interests, we consider the nonexclusive list of factors enumerated in Iowa Code section 598.41(3) and *In re Marriage of Hansen,* 733 N.W.2d 683, 696 (Iowa 2007). Factors to be considered include (1) continuity, stability, and approximation; (2) "the ability of the spouses to communicate and show mutual respect"; (3) "the degree of conflict between parents"; and (4) "the degree to which the parents are in general agreement about their approach to daily matters." *Hansen,* 733 N.W.2d at 696–99. Not all factors are given equal consideration, and the weight of each factor depends on the specific facts and circumstances of each case. *In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). "The critical

issue is determining which parent will do a better job raising the child; gender is irrelevant, and neither parent should have a greater burden than the other in attempting to gain custody in an original custody proceeding." *In re Marriage of Decker*, 666 N.W.2d 175, 177 (Iowa Ct. App. 2003). A child custody decision is not a reward for a parent's good conduct, nor is it a punishment for bad conduct. *Kleist,* 538 N.W.2d at 277.

Although Justin was involved in caring for K.K. while he lived in the marital home, Sarah has been the primary caretaker for K.K. since the child's birth. When asked how he participated in parenting K.K. before he moved out, Justin testified he "would change her diapers and hold her." Since Sarah began working from home when K.K. was approximately four months old, she has been able to maintain full-time care of K.K., even during typical working hours. Additionally, K.K. was approximately six months old when Justin moved out, and Sarah has had physical care of K.K. since that time.

The parties have struggled with communication since they separated. Justin maintains Sarah has "overblown" the issue, but the district court specifically found, "Justin and Sarah have significant difficulty communicating with each other."[2] We acknowledge communication problems can be magnified by divorce proceedings, but the record supports the district court's finding. The parties have only communicated through text message and emails since Justin

---

[2] This is one of the few factual findings the district court made in support of its custody decision. The court is charged with providing reasons why it declined to award joint physical care, yet here, the court recited the applicable case law and then simply concluded it was in K.K.'s best interests to be placed in Sarah's physical care. On our de novo review, we discern specific reasons for the denial of the request for joint physical care.

sent Sarah a text message indicating that he was not coming home. Even through those mediums, the parties struggled to discuss simple things necessary for K.K.'s care like when and how much she had last eaten. In October 2014, the court recommended the parties keep a journal that could be sent back and forth with K.K., but Sarah testified the journal did not alleviate the problem. In December 2014, the parties were unable to agree on a plan for when to switch K.K. from breast milk to cow's milk, and Justin ultimately just made the switch one day while K.K. was in his care.

Additionally, siblings—including half-siblings—in dissolution actions should only be separated for compelling reasons. *In re Marriage of Quirk–Edwards*, 509 N.W.2d 476, 480 (Iowa 1993). Here, we find no compelling reason to overcome the presumption. We recognize that K.K. has half-siblings through both her mother and her father, but only Sarah has physical care of K.K.'s half-siblings. The district court was careful to schedule Justin's parenting time with K.K. when he has parenting time with his other children, which will enable K.K. to maintain a bond with her father's other children. Additionally, Sarah has shown her willingness to foster a relationship between K.K. and Justin's children, but the same cannot be said for Justin, whose actions demonstrate a reluctance to foster a relationship between K.K. and Sarah's children.

Having considered all of the factors listed above, we agree with the district court that placing K.K. in Sarah's physical care is in K.K.'s best interests.

**B. Scheduled Parenting Time**

Pursuant to the dissolution decree, Justin has scheduled parenting time with K.K. every other week from 5:00 p.m. on Saturday until 5:00 p.m. on Sunday.[3] Justin has parenting time with K.K. from Tuesday evening until 4:00 pm Wednesday evening, on the weeks he does not have weekend parenting time.[4] Justin asks that we provide him with more scheduled parenting time of K.K. He asks "at a minimum" to have K.K. in his care alternating weeks in the summer and during spring break in odd years in order to mirror his schedule with his other children.

The district court decree awarded Justin only one overnight with K.K. each week. The district court ordered parenting time from Saturday to Sunday, as opposed to Friday to Sunday, on alternating weekends. We assume this is due to the testimony that Justin spends approximately four hours on Friday evenings traveling to pick up and return home with one of his other children for parenting time. Even if the court determined that amount of travel time was not in K.K.'s best interests at her age at the time of trial, Justin should receive more time with K.K. *See* Iowa Code § 598.41(a) ("The court, insofar as is reasonable and in the best interest of the child, shall order . . . liberal visitation rights where appropriate, which will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents after the parents have separated or dissolved the marriage, and which will encourage parents to share the rights and

---

[3] When K.K. begins kindergarten, the parenting time is modified to 5:00 p.m. on Friday until 5:00 p.m. on Sunday.

[4] When K.K. begins kindergarten, the parenting time is modified to occur every Tuesday, but to last only from after school until 7:30 p.m.

responsibilities of raising the child."). Because Justin and Sarah live approximately fifteen miles apart and Justin has an atypical work schedule, mid-week parenting time is possible. We expand the parenting schedule to extend Justin's weekend time with K.K. to Friday at 5:00 p.m. until Sunday at 5:00 p.m. to begin now rather than waiting until K.K. begins kindergarten. Additionally, we add scheduled parenting time from Thursday at 4:00 p.m. until Friday at 4:00 p.m. on the weeks Justin does not have Tuesday overnight parenting time.[5]

Additionally, we adjust the parenting schedule so Justin can have parenting time with K.K. along with his other children on spring breaks in odd years. We decline to expand the summer parenting schedule; the district court provided a thoughtful schedule that already includes additional parenting time for Justin each summer, which evolves as K.K. ages.

We remand to the district court to recalculate child support in light of the additional parenting time. If the child support award needs to be recalculated due to the application of the extraordinary visitation credit, the district court is to modify the obligation "based on the present financial circumstances of the parties and the child support guidelines." *See In re Marriage of Hoffman*, 867 N.W.2d 26, 37 (Iowa 2015).

### C. Equitable Distribution

In Iowa, we "divide the property of the parties at the time of divorce, except any property excluded from the divisible estate as separate property, in

---

[5] In other words, on odd weeks, Justin will have scheduled parenting time with K.K. from Tuesday evening until Wednesday evening, and then from Friday at 5:00 p.m. until Sunday at 5:00 p.m. On the even weeks, Justin will have scheduled parenting time from Thursday at 4:00 p.m. until Friday at 4:00 p.m.

an equitable manner in light of the particular circumstances of the parties." *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005); *see* Iowa Code § 598.21(5). We divide "not only property acquired during the marriage by one or both parties, but property owned prior to the marriage by a party" as well. *Schriner,* 695 N.W.2d at 496. One of the many factors we consider is the property brought into the marriage by each party. *See* Iowa Code § 598.21(5). "An equitable distribution does not mean an equal division." *Schriner*, 695 N.W.2d at 499.

Justin maintains the district court's distribution of the marital assets and debts was inequitable because he was given "the vast majority of the debt." Justin was ordered to assume responsibility for all of the credit card debt, half of the loan in Sarah's parents' names, and any new debt taken in his name. Sarah was awarded the marital home and the equity in it and was ordered to assume responsibility for half of the loan in her parents' names as well as the home equity loan. Justin claims the distribution would be more equitable if Sarah was ordered to assume responsibility for the entirety of the debt in her parents' names.

Here, the parties were married less than five years. Sarah was approximately forty years old at the time of the dissolution and Justin was approximately thirty-four years old. Both were in good health and were employed fulltime, however Justin earned almost $30,000 more each year than Sarah earned.[6] Sarah brought $21,000 premarital equity from her prior home into the

---

[6] We acknowledge Sarah's earning capacity is most likely more than the $37,000 she earns as a medical transcriptionist. Before Sarah changed jobs in March 2014, she

marriage. Additionally, during the pendency of the proceedings, Sarah spent approximately $18,000 paying marital debts while Justin stopped making payments toward the marital debt, except the two payments he made toward the home equity loan. Sarah was also able to lower or eliminate the interest being charged on the parties' credit card debt by negotiating with the credit card companies, which in turn reduced the required monthly payments. The district court did not equally distribute the marital debt between the two parties, but we cannot say the distribution was inequitable. If we adjusted the debt as Justin asks, Sarah would be forced to take on more of the marital debt than Justin even though she earns significantly less money and, presumably, has fewer years left to work before retirement. Justin rationalizes the discrepancy by arguing that $4200 of the credit card debt he was ordered to pay was not marital because it was money used to pay Sarah's attorney fees for the dissolution proceedings, but that ignores the fact that any payments to Justin's attorney were also made with marital assets.

The district court's distribution of marital debts and assets was equitable, thus we decline to change the economic provisions of the dissolution decree.

### D. Attorney Fees

Both parties ask the court to award them appellate attorney fees. Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). Factors

---

worked for the Pella Police Department and earned approximately $50,000 annually. Sarah changed jobs after Justin received a mandatory shift change at work that would have left the children without supervision multiple hours each day. At the dissolution hearing, Sarah testified she intends to continue working as a medical transcriptionist until K.K. starts school.

to be considered in determining whether to award attorney fees include: "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). Although Justin was partially meritorious on appeal, after considering Sarah's need for appellate attorney fees and Justin's ability to pay, we award Sarah $2500 in appellate attorney fees.

Costs are assessed to Justin.

**AFFIRMED AS MODIFIED AND REMANDED.**